**Hilary B. MILLER, Plaintiff,**

v.

**Frank GRIGOLI, Stephen Rosenberg, Harlan J. Funk, Albert E. Barrette, and Astor Securities, Inc., Defendants.**

**No. 88 CIV 2427 (LBS).**

United States District Court, S.D. New York.

April 27, 1989.

Hilary B. Miller, Stamford, Conn., pro se.

Daniel A. Zimmerman, New York City, for Grigoli.

Gordon Hurwitz Butowsky, Weitzen, Shalvo & Wein, New York City, for Rosenberg; William R. Weinstein, Steven A. Coploff, of counsel.

Anderson Russell Kill & Olick, P.C., New York City, for Funk; John H. Gross, of counsel.

Fulbright Jaworski & Reavis McGrath, New York City, for Barrette and Astor Securities, Inc.; Glen Banks, of counsel.

## OPINION

SAND, District Judge.

Hilary Miller, proceeding *pro se*, seeks rescission and damages in connection with his purchases of limited partnership interests in Buttonwood Tree Partners ("Buttonwood"), a Texas limited partnership organized for the purpose of investing in, owning, and managing residential real estate in Dallas, Texas. Miller, a lawyer and investment banker, alleges that Frank Grigoli and Stephen Rosenberg, the general partners of Buttonwood, Harlan J. Funk, the founding limited partner of Buttonwood and a general partner from January 1986 to October 1986, and Albert E. Barrette, president and controlling stockholder of Astor Securities, Inc. ("Astor"), a SEC-registered securities broker-dealer, made misstatements or omissions in the documents they provided to Miller. Miller seeks relief for violations of § 12(2) of the 1933 Securities Act, 15 U.S.C. § 77*l*(2) (1981), § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) (1981) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1986), and Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1962 (1982), as well as for his claim of common law fraud.

From February 21, 1989 through February 23, 1989, this Court held a bench trial, after which the parties submitted proposed findings of fact and conclusions of law. The Court, having considered the evidence and the submissions of the parties, now renders its decision. This Opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

In November of 1984, Barrette contacted Miller, at the suggestion of a friend of Miller's, to see if he would be interested in investing in Buttonwood. Miller requested the offering materials, and on November 13, 1984, he received a package containing, *inter alia*, a transmittal letter dated November 12, 1984 (Trial Exh. E), an offering summary dated June 25, 1984 (Trial Exh. C), draft projections dated June 25, 1984 (contained within Trial Exh. D), offering

projections dated July 11, 1984 and July 13, 1984 (Trial Exh. T at 2, 3), an aerial photograph showing the location of Buttonwood properties (Trial Exh. B), and an opinion and other materials from Arnold & Porter. Tr. at 12; Pre–Trial Order at 4. The November 12, 1984 letter from Barrette to Miller read in pertinent part:

Regardless of the direction of the Dallas market, we feel our partnership is insulated because of the following factors:

— Rents at or below market

— Land costs averaging $29/land foot

— Debt level in the partnership currently approximately 39%

— Working capital and renovation reserve in excess of 2 million dollars

— Significant lines of credit (i.e. Citibank, Chicago Savings and Loan).

Trial Exh. E.

Several days later, Barrette and Miller met and discussed the merits of the offering. Miller understood that the sale of the partnership units was "ongoing," Tr. at 60, 73, 75–76, 97, and that the investment had advantageous tax consequences. Tr. at 60, 99, 104. At trial, Miller also described the offering as "an evergreen offering," meaning that "[i]t continued ... until the window closed and there were no longer any people interested in investing in tax-advantaged investments. There was never any aggregate limit on the number of limited partnership interests that could be sold." Tr. at 87–88. According to Barrette, the syndication was "very unique" because there was no deadline [1] and no provision for the return of funds if goals were not reached. Tr. at 294; *see also* Tr. at 323. In addition, no capital contribution was necessary because of the willingness of Citi-

bank to provide loans to individual investors. Tr. at 306. At the close of the meeting, Miller said that he would need additional time to reach a decision. Tr. at 25.

During the last week in November, Miller received the subscription materials (Trial Exh. G). Without consulting lawyers or accountants and without requesting additional or updated documents or making further inquiries of the general partners, Miller completed, signed, and returned the subscription materials to Barrette on January 4, 1985. Tr. at 41–43; 139–40. Included in the Subscription Agreement were provisions that the investor had read the Subscription Agreement; that the investor had consulted outside advisers as needed and could not rely on statements or documents provided by a broker; and that the subscription materials were the only materials upon which the investor could rely. Trial Exh. G §§ 3.8–3.11, 4; *see* Tr. at 64. Miller's subscription was accepted by the partnership on January 30, 1985 and received by Miller on February 5, 1985. Trial Exh. G. Miller's investment for his Class A Limited Partnership interest was $100,000.

On December 2, 1985, Miller received a letter from the partnership along with the partnership's 1984 financial statements. Trial Exh. P. After reading the financial statements, Miller concluded that they did not agree with the package of documents that he had received in November 1984. Tr. at 26. He found discrepancies between Barrette's November 12, 1984 letter and the 1984 financial statements. For example, Miller claims that the ratio of the partnership's liabilities to the book value of its properties at that date was 80.4%, rather than 39%; the partnership's working capi-

---

**1.** As Funk explained during trial, *see* Tr. at 193–98, after the partnership acquired its first property, which it did by raising all of the equity for that property, it had an opportunity to purchase a second property, Preston Ridge. The partnership purchased Preston Ridge without having raised the equity, but with the goal of raising the equity later, which it also did. In raising money for the third property, Woodchase, the partnership did not know how much money it would be able to raise, so it made provision in § 6.3 of the Woodchase offering documents in case all of the money was not raised. The partnership was able to buy the fourth property, Valley View Trail, on terms that required little cash. The partnership took advantage of opportunities as they arose in its effort to create an assemblage in North Dallas. The partnership sold additional units to finance later acquisitions. Tr. at 193. Investors were kept advised in the offering papers that the partnership intended to acquire additional properties. Tr. at 198.

tal reserves in December 1984 were $67,-000, rather than $2 million; the partnership had a negative cash flow in excess of $3,800,000 in 1984, rather than a small positive cash flow, and the partnership had acquired a new property, Valley View, financed largely by incurring new debt. Tr. at 28–30. Miller, however, made no inquiries and took no action with respect to his alleged discoveries. Tr. at 68–69. At trial, he explained: "I was not in a position to do very much about it, and I elected not to do anything about it." Tr. at 31.

During 1986, Miller received letters from the partnership informing him that the real estate market in Dallas was not doing well. Tr. at 31. On February 2, 1987, Miller received a letter requesting additional funding to enable the partnership to survive. After Miller received another letter requesting funds in March 1987, he was in contact with Barrette, who suggested that he speak with Christopher Angell, a limited partner and a member of the liaison committee between the partnership and its general members. Angell advised Barrette that the additional investment would not lead to a profit, but rather to the avoidance of negative tax consequences. Tr. at 32. On March 16, 1987, Miller invested an additional $20,000 in a Class B Limited Partnership interest.

In early April 1987, Miller received a cover letter dated March 31, 1987, which accompanied the partnership's private placement memorandum relating to his investment of March 1987. When Miller read the memorandum some time in April of 1987, he discovered disclosures that he claims had not been made in previous documents. Tr. at 33. For example, the memorandum included seventeen single-spaced pages of risk factors relevant to the investment.

Miller did not recall any further contact with the partnership until its notice of January 1988, informing him that the partnership had filed for Chapter 11 on December 15, 1987. Tr. at 34. Miller filed his complaint in this case on April 7, 1988.

## CONCLUSIONS OF LAW

### I. Statutes of Limitations

The threshold issue that defendants raise, and that we must address before reaching the merits of the case, is whether any of Miller's claims are time-barred by the applicable statute of limitations. Miller alleges with respect to each of his two investments that defendants violated § 12(2), § 10(b) and Rule 10b–5, and RICO, and also engaged in common law fraud.

■ To determine the applicable limitations period for a § 10(b) and Rule 10b–5 claim, federal courts look to the law of the forum state. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976). In this diversity case, where plaintiff is a citizen of Connecticut and defendants are citizens of New York, *see* Pre–Trial Order at 1, 3, a federal court sitting in New York, hearing an action initiated by a non-resident plaintiff, looks to the New York "borrowing statute." The New York borrowing statute provides that such an action "cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued." N.Y.Civ.Prac.L. & R. § 202 (McKinney 1972).

The Second Circuit has held that a claim accrues in the state where plaintiff suffered his alleged injury. *See Stafford v. International Harvester Co.*, 668 F.2d 142, 148–50 (2d Cir.1981); *Industrial Consultants, Inc. v. H.S. Equities, Inc.*, 646 F.2d 746, 747 (2d Cir.), *cert. denied*, 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981). In cases involving securities fraud, courts in this Circuit have held that an individual plaintiff usually suffers his injury in the state in which he resides. *See, e.g., Grosser v. Commodity Exchange, Inc.*, 639 F.Supp. 1293, 1299–1300 (S.D.N.Y.1986), *aff'd mem.*, 859 F.2d 148 (2d Cir.1988); *Klock v. Lehman Brothers Kuhn Loeb, Inc.*, 584 F.Supp. 210, 215 (S.D.N.Y.1984) ("To the extent plaintiff became a poorer man, he became a poorer Connecticut resident.").

■ The applicable limitations period for a § 10(b) and Rule 10b–5 action governed by Connecticut law generally has been held to be two years after the contract of sale for securities. *See* Conn.Gen.Stat. § 36–498(e); *Dandorph v. Fahnestock & Co.,* 462 F.Supp. 961, 963 (D.Conn.1979)[2]; *Long v. Abbott Mortgage Corp.,* 424 F.Supp. 1095, 1097 (D.Conn.1976); *see also Appel v. Kidder, Peabody & Co., Inc.,* 628 F.Supp. 153, 156 (S.D.N.Y.1986) ("The District Court for the District of Connecticut has repeatedly held that the two-year period is the appropriate limitation on § 10(b) claims under Connecticut law, as have the other federal courts which have considered the issue.") (footnote omitted). Miller completed and returned the subscription agreement to Barrette on January 4, 1985; the partnership accepted the subscription on January 30, 1985; and Miller received the countersigned and accepted copy of his subscription agreement on February 5, 1985. Even if we use the latest date as the date of contract,[3] Miller's § 10(b) and Rule 10b–5 claim as to his first investment is time-barred because he did not file his complaint until April 7, 1988.

If we use "the more lenient tolling principle," *Dandorph, supra,* 462 F.Supp. at 964, of two years from the date "the wrong should reasonably have been discovered," *Long, supra,* 424 F.Supp. at 1099, as federal law would allow, *Hitchcock v. deBruyne,* 377 F.Supp. 1403, 1404 (D.Conn. 1974), Miller's claim of § 10(b) and Rule 10b–5 violations with respect to his first investment are still time-barred. Miller testified at trial that he first had reason to believe he had been defrauded in December 1985, when he received the 1984 financial statements. Tr. at 19, 26–27, 71. He testified that he received the 1984 financial statements on December 2, 1985, Tr. at 26, but did not study them and reach his conclusions until "sometime in the first quar-

ter of calendar year 1986." Tr. at 27. Whether we use December 2, 1985 or the later date of March 1986 (the last month in the first quarter of calendar year 1986), Miller did not file his complaint until April 7, 1988, which was more than two years from either date. Accordingly, Miller's claim of a violation of § 10(b) and Rule 10b–5 with respect to his first investment is time-barred. However, Miller's § 10(b) and Rule 10b–5 claim with respect to his second investment made on March 16, 1987, less than two years from the filing of his April 7, 1988 complaint, still remains to be considered on the merits. *See infra* pp. 1093–94.

Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m (1981) establishes the following limitations for Miller's claims brought under § 12(2):

> No action shall be maintained to enforce any liability created under section 77k or 77l(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under ... section 77l(2) of this title more than three years after the sale.

The three-year bar is an absolute outer limit, and plaintiff concedes that it bars his recovery for the loss of his initial $100,000 investment. Plaintiff's Opposition to Defendant Rosenberg's Motion for Summary Judgment at 23; Plaintiff's Proposed Findings of Fact and Conclusions of Law at 17 ("Plaintiff's Proposed Findings").

■ Plaintiff's § 12(2) claim with respect to his second investment on March 16, 1987 was within the three-year period but not within the one-year period from the time when plaintiff had "enough facts to be on inquiry notice of a potential claim." *Ingen-*

---

**2.** Although the statute cited in *Dandorph,* Conn. Gen.Stat. § 36–346(e), was repealed by Conn. Pub.Act 77–482 § 21, the new statute of limitations, Conn.Pub.Act 77–482 § 30(e), shares the same language and time frame as the earlier statute. *Dandorph,* 462 F.Supp. at 963 n. 4.

**3.** By its own terms, the Subscription Agreement becomes effective when the Subscriber receives a copy of the Agreement, accompanied by a copy of the Acceptance of Subscription annexed to the Agreement executed by the partnership. *See* Trial Exh. G at 2, § 1. Accordingly, the date of February 5, 1985 would be the date of contract.

*ito v. Bermec Corp.*, 441 F.Supp. 525, 554–55 (S.D.N.Y.1977). Accordingly, plaintiff's second § 12(2) claim is time-barred as well.

At trial, plaintiff testified to facts that indicate he was on inquiry notice more than one year from the time he filed his complaint. As early as December 1985 or the first quarter of calendar year 1986, when Miller received and reviewed the partnership's 1984 financial statement, he discovered alleged misstatements or omissions that put him on notice, though he chose to make no inquiries and take no action. Tr. at 31. During 1986 he received letters from the partnership indicating that the "Dallas real estate market was not doing well" and that "we were all experiencing difficulties." *Id.* On February 2, 1987, he received a letter from the partnership indicating that it needed "additional capital in order to survive." Miller "did nothing in response to that letter except wait." *Id.* The only action that Miller took was to invest an additional $20,000 in the partnership on March 16, 1987.

After the investment, Miller received the partnership's private placement memorandum that enumerates risks of which Miller claims no prior knowledge and on which he bases his § 12(2) claim for his second investment. The memorandum (Trial Exh. V) was accompanied by a cover letter dated March 31, 1987, and its title page suggests that it required immediate attention. The title page contains a notice to investors that they could rescind their purchase by indicating their intention to do so by 4 p.m. on April 13, 1987. Miller claims not to have read the memorandum until "mid-April, 1987," Plaintiff's Proposed Findings at 12, or "late in April of 1987," Tr. at 33, though he was in receipt of it since "early April 1987," Tr. at 32–33, which may or may not be within one year of the filing of his April 7, 1988 complaint.

However, even if the memorandum contained risks that had never been disclosed, it also contained risks of which Miller had been aware for some time. In his Proposed Findings at 13, he gives examples of the risks contained in the memorandum: "general economic conditions, lack of required additional capital." These were precisely the risks of which he had been made aware by the partnership's letters throughout 1986, and also by its letter of February 2, 1987. Tr. at 31. The risks of which Miller had been aware prior to the memorandum were sufficient to have placed him on inquiry notice. For a plaintiff to be placed on inquiry notice, he "need only have known of the *possibility* of fraud, not of the actual nature of the alleged fraud." *Bresson v. Thomson McKinnon Securities, Inc.*, 641 F.Supp. 338, 345 (S.D.N.Y. 1986) (emphasis added). Miller had a duty of inquiry that he failed to undertake, and this duty arose prior to the memorandum, which places his § 12(2) claim for his second investment beyond the one-year limitation.

■ Miller's common law fraud claim with respect to his first investment, but not with respect to his second investment, is also time-barred. The Second Circuit has repeatedly held that New York's borrowing statute applies to a common law fraud claim based upon violations of the federal securities laws in an action instituted in New York by a non-resident, and that such an action accrues in the state of the plaintiff's residence. *See, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir.1983); *Industrial Consultants, Inc. v. H.S. Equities, Inc., supra*, 646 F.2d at 747; *Klock, supra*, 584 F.Supp. at 214. Plaintiff's fraud claims, having accrued in Connecticut, *see supra* p. 1090, must be governed by the shorter of the New York or Connecticut statute of limitations. *See* N.Y.Civ. Prac.L. & R. § 202 (McKinney 1972). Connecticut's limitations period of three years for claims based on common law fraud, *see* Conn.Gen.Stat. § 52–577,[4] compared to New York's limitations period of six years for securities fraud actions, *see* N.Y.Civ. Prac.L. & R. § 213(8) (McKinney 1972), is controlling.

■ In this case, Miller received materials allegedly containing omissions and mis-

---

4. Conn.Gen.Stat. § 52–577 provides as follows: "No action founded upon a tort shall be brought

but within three years from the date of the act or omission complained of."

representations prior to his first investment, which he made in February of 1985, *see supra* p. 1091, n. 3., more than three years from April 7, 1988, when he filed his complaint. Accordingly, his common law fraud claim with respect to his first investment is time-barred. However, Miller received materials allegedly containing omissions prior to his second investment, which he made on March 16, 1987, less than three years from the filing of his complaint. Therefore, his common law fraud claim pertaining to his second investment is not time-barred and requires consideration on the merits.

Miller's § 10(b) and Rule 10b–5 and common law fraud claims with respect to his second investment only and his RICO claim,[5] having survived the initial inquiry into claims barred by statutes of limitations, are now to be considered on their merits.

## II. The Merits

■ Section 10(b) and Rule 10b–5 require plaintiff "to show in connection with the purchase or sale of securities, that defendant, acting with scienter, made a false material representation or omitted to disclose material information, and that plaintiff's reliance on defendant's action caused him injury." *duPont v. Brady*, 646 F.Supp. 1067, 1072 (S.D.N.Y.1986), *rev'd on other grounds*, 828 F.2d 75 (2d Cir.1987); *see Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985).

The Court finds that the November 12, 1984 letter contained representations that were not true at the time that Barrette delivered the letter to Miller. However, we accept as credible Barrette's testimony concerning what was said to Miller at the time of delivery of this letter and to the extent inconsistent with that testimony, reject Miller's version of this conversation. Moreover, any false impressions created by that letter were overcome by the fact that the partnership continued to update its material and that Miller knew according to the terms of the Subscription Agreement that he could rely only on the Agreement and not on representations made by a broker. In addition, defendants Grigoli, Funk, and Rosenberg neither assisted in the preparation of nor gave their approval to the letter and other offering materials that Barrette sent to Miller and other potential investors. *See, e.g.,* Tr. at 156, 173 (Funk's Testimony).

Plaintiff alleges that the risks disclosed in the private placement memorandum dated March 27, 1987 were omitted in the partnership's Preferred Limited Partnership Interest offering materials, on which he based his decision to make his March 16, 1987 investment. The Supreme Court has defined the standard for materiality as "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder[,]" or "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Miller claims that he would not have invested had he known the full extent of the risks. However, Miller was aware of many of the risks as a result of the partnership's letters in 1986 and 1987. He needed to make the additional investment to avoid negative tax consequences and he did little to educate himself about the investment even though he knew the partnership was in trouble. The omissions Miller complaints of appear to fall short of the Supreme Court's standard of

---

5. Defendants do not raise the statute of limitations as a bar to plaintiff's RICO claim. RICO actions are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). The date the statute of limitations begins to run is governed by federal law. *Zola v. Gordon,* 685 F.Supp. 354, 372 (S.D.N.Y.1988). Plaintiff's RICO claim is filed under four years from the alleged predicate acts, including but not limited to the mailing of the Class A Limited Partnership Interest offering materials and the mailing of the Preferred Limited Partnership Interest offering materials.

materiality, but even if we were to assume *arguendo* that they were material, Miller must still establish defendants' scienter.

Miller fails to carry his burden of establishing defendants' scienter. In *Ernst & Ernst, supra,* 425 U.S. at 191 n. 7, 96 S.Ct. at 1380 n. 7, the Supreme Court made clear that a § 10(b) and Rule 10b–5 claim requires a showing of "an intent to deceive, manipulate, or defraud"; mere negligence will not suffice. *See id.* at 193, 201, 214, 96 S.Ct. at 1380, 1384, 1391. Both before and after *Ernst & Ernst,* the Second Circuit has held that "some type of scienter—*i.e.,* intent to defraud, reckless disregard for the truth, or knowing use of some practice to defraud—is necessary in such an action." *Id.* at 194 n. 12, 96 S.Ct. at 1381 n. 12; *see, e.g., Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir.1973) (*en banc*). At trial and in his submissions, Miller failed to establish such intent among defendants. Moreover, even if the offering materials had omissions, and even if they were material, defendants' March 27, 1987 memorandum, disclosing the risks that Miller claims were previously omitted, gave investors, including Miller, the opportunity to rescind their agreement and to recover their money. Trial Exh. V. at 1, 47.

■ Miller also fails to carry his burden with respect to causation. In cases of omission it is impossible for the injured party to show reliance, *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975), and therefore, proof of reliance is not a prerequisite to recovery. *Affiliated UTE Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Although there is a presumption of reliance or causation, *id.* at 153–54, 92 S.Ct. at 1472; *Titan Group, Inc.,* 513 F.2d at 239, the Court finds that defendants have rebutted this presumption by a preponderance of the evidence. *duPont v. Brady, supra,* 828 F.2d at 79.

The defendants have established that Miller had reason to believe that there were risks involved in the second investment, that even if the full panoply of risks was not disclosed at the time of his investment, he was made aware of them before his investment became irrevocable, and that the risks were unlikely to deter him from investing because of the unfavorable tax consequences were he not to invest. The conclusion that Miller was likely to make the investment, regardless of the risks, is buttressed by the cursory fashion in which he approached the investment. He did not consult his own outside advisors; he relied on documents on which he should not have relied; he did not request other documents; he did not review in a timely manner the documents he had received; and he reached his decision to invest based upon one telephone conversation with a partner from the liaison committee. Tr. at 32. In sum, this Court rejects as contrary to fact plaintiff's testimony in which he claims reliance. All of the facts and circumstances, such as plaintiff's sophistication as an investor and the nature of the transaction, lead the Court to this conclusion.

Miller has failed to show that defendants' omissions, even if they were material, were made with scienter and he has also failed to rebut defendants' showing by a preponderance of the evidence of his nonreliance. Accordingly, Miller's claim under § 10(b) and Rule 10b–5 with respect to his second investment must fail.

■ Miller also fails to carry the burden required of his RICO claim. Even if we assume that the Class A Limited Partnership's offering materials contained material misstatements or omissions, the partnership continued to update its documents. Indeed, Miller testified that he first believed he had been defrauded upon reviewing the 1984 financial statement that the partnership sent him. Similarly, he testified that he became aware that he had been defrauded with respect to his second investment upon receiving the private placement memorandum that the partnership also sent him. Recently, the Second Circuit has said that with respect to an enterprise whose nature "does not of itself suggest that racketeering acts will continue," there must be "proof of continuity or the threat

of continuity of racketeering activity ... in some factor other than the enterprise itself." *Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.1989) (*en banc*). Although the Second Circuit found such proof in the pleadings in *Beauford,* we fail to find such proof in Miller's case. Here, in fact, the partnership's updating of materials, which was made available to the limited partners through mailings and by request, precludes a finding of a continuing RICO pattern, or the threat of a continuing RICO pattern. The absence of continuity or its threat is fatal to Miller's RICO claim, and accordingly, it is denied.

 Although we have no federal claims remaining before us, and only plaintiff's state law claim of common law fraud, we choose to exercise our diversity jurisdiction over this issue as well. As to Miller's common law fraud claim with respect to his second investment, this claim too must fail.[6] Under New York law, the essential elements of common law fraud are: a material misrepresentation of an existing fact; scienter; justifiable reliance; and proximate causation. *See Idrees v. American University of the Caribbean,* 546 F.Supp. 1342, 1346 (S.D.N.Y.1982); *Van Alen v. Dominick & Dominick, Inc.,* 441 F.Supp. 389, 402–03 (S.D.N.Y.1976), *aff'd,* 560 F.2d 547 (2d Cir.1977); *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y. 2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958). The evidence of fraud must be "clear and convincing" and any inference of fraud must be "unequivocal." *See Manchel v. Kasdan,* 286 A.D. 483, 484, 144 N.Y.S.2d 694 (1st Dep't 1955), *aff'd mem.* 1 N.Y.2d 734, 151 N.Y.S.2d 940, 134 N.E.2d 687 (1956). Miller has failed to establish a material misrepresentation in the Preferred Limited Partnership Interest offering materials (Trial Exh. R). But even if Miller established that the omission of risks in these offering materials amounted to concealment, which is "tantamount to a fraudulent representation," *Idrees, supra,* 546 F.Supp. at 1349, his common law fraud

claim would still fail because he never establishes scienter, justifiable reliance and causation, as discussed *supra* pp. 1093–94 in connection with his § 10(b) and Rule 10b–5 claims.

## CONCLUSION

For the reasons stated above, Miller's § 10(b) and Rule 10b–5 and common law fraud claims with respect to his first investment are time-barred, as are his § 12(2) claims with respect to both of his investments. Plaintiff has failed to sustain his burden of proof with respect to his surviving claims, which include his § 10(b) and Rule 10b–5 and common law fraud claims based on his second investment. The Court finds that even if defendants made material omissions, they were not made with the requisite scienter nor relied upon by plaintiff nor the cause of his harm. As to his RICO claim, plaintiff has failed to show a continuing RICO pattern or the threat of a continuing RICO pattern. Accordingly, the relief sought by plaintiff is hereby denied and the complaint is dismissed.

SO ORDERED.

---

6. We note that the section in Miller's Proposed Findings entitled Conclusions of Law is silent on the question of common law fraud. We nevertheless consider the claim because Miller raised it as Count IV in his complaint and addressed it in his Memorandum in Opposition to Defendant Rosenberg's Motion for Summary Judgment.