**BERKS COUNTY EMPLOYEES'
RETIREMENT FUND,**
Plaintiff,

v.

**FIRST AMERICAN CORPORATION,**
et al., Defendants.

No. 08 Civ. 5654(LAK).

United States District Court,
S.D. New York.

Aug. 31, 2010.

James J. Sabella, Stuart M. Grant, Michael J. Barry, Peter B. Andrews, Grant & Eisenhofer P.A., for Plaintiff.

Robert F. Serio, Aric H. Wu, Gabriel Herrmann, Gibson, Dunn & Crutcher LLP, for Defendants.

## MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.

This is a purported class action for alleged violations of the Securities and Exchange Act of 1934 (the "Exchange Act") by a real estate appraisal company. The complaint alleges that defendants fraudulently inflated appraisal values at the direction of their client, Washington Mutual, Inc. ("WaMu"). The matter is before the Court on plaintiff's motion for class certification.

### Facts

*Background*

First American Corporation ("First American") is a public holding company that provides financial products and services.[1] First American eAppraiseIT, LLC ("eAppraiseIT"), one of First American's approximately 450 subsidiaries,[2] offers real estate appraisal services to mortgage lenders, real estate agents, and investors.[3] In 2006, eAppraiseIt entered into an agreement with WaMu, a bank holding company, pursuant to which eAppraiseIT provided appraisals to WaMu in connection with residential mortgage applications. eAppraiseIT earned approximately $50 million in revenue from its relationship with WaMu in 2006 and 2007,[4] which represented approximately 0.3 percent of First American's revenue in those years.[5]

In 2007, the New York Attorney General ("NYAG") commenced an industry-wide investigation of real estate appraisal practices. It issued a subpoena to eAppraiseIT on May 22, 2007,[6] sued First American and eAppraiseIT on November 1, 2007. The complaint alleged that:

"First American and eAppraiseIT have abdicated their role in proving 'third-party, unbiased valuations' for eAppraiseITs largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values." [7]

*This Action*

Lead plaintiff Berks County Employees' Retirement Fund ("Berks"), a pension fund, brought this action in June 2008 against First American, eAppraiseIT, and five of their current and former officers and directors for alleged violations of the Exchange Act. The complaint alleges,

---

**1.** Am. Cpt. ¶ 14.

**2.** Def. Ex. A, 2006 10–K Ex. 21 ("Subsidiaries of the Registrant"); Def. Ex. B, 2007 10–K Ex. 21 (same).

**3.** Am. Cpt. ¶ 15.

**4.** *Id.* at ¶ 46.

**5.** *See* Kleidon Decl. Ex. 3.

**6.** Am Cpt. ¶ 83.

**7.** *Id.* ¶ 5.

among other things, that defendants' "improper appraisal practices rendered [their] statements about the quality and accuracy of [their] appraisal business and compliance with ethical and legal guidelines false and misleading" and "caused certain of [their] reported financial information, including revenues associated with home appraisal, to be materially overstated." [8] Berks now moves to certify a class of "all persons or entities who purchased and/or otherwise acquired common stock issued by First American Corporation between and including April 26, 2006 and November 6, 2007." [9]

## Discussion

Rule 23(a) requires proof of four elements: (1) numerosity, (2) the presence of common issues, (3) typicality, and (4) that the plaintiff and its counsel would represent the class adequately.[10] Where, as here, the principal relief sought is money damages, Rule 23(b)(3) requires that the plaintiff establish also that "the questions of law or fact common to class members predominate over any questions affecting only individual members ('predominance'), and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ('superiority')." [11]

■ Before certifying a class, a district court is obliged to conduct a "rigorous analysis" to determine whether the plaintiff has satisfied all of the requirements.[12] It "may certify a class only after [it] . . . resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met.' " [13] The Court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." [14] The burden of demonstrating its satisfaction by a preponderance of the evidence, moreover, rests with the moving party.[15]

In this case, there is no dispute here that the proposed class is sufficiently numerous and that Berks's counsel would represent the class adequately. The contested issues are whether common issues predominate and whether Berks's claims are typical of those of the class as a whole.

## Predominance

■ The Court may certify the proposed class under Rule 23(b)(3) only if Berks demonstrates "that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof." [16] This inquiry, which focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [,] tests whether proposed classes are

---

8. *Id.* ¶ 7.

9. Pl. Mem. 1.

10. FED.R.CIV.P. 23.

11. *Brown v. Am. Honda (In re New Motor Vehicles Canadian Exp. Antitrust Litig.),* 522 F.3d 6, 18 (1st Cir.2008).

12. *In re Initial Pub. Offerings Sec. Litig. ("In re IPO "),* 471 F.3d 24, 41 (2d Cir.2006); *In re Parmalat Sec. Litig.,* Master Docket No. 04 MD 1653(LAK), 2008 WL 3895539, at *2 (S.D.N.Y. Aug. 21, 2008).

13. *In re IPO,* 471 F.3d at 41 (2d Cir.2006).

14. *Id.* at 42.

15. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008).

16. *In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 480 (2d Cir.2008) (quoting *Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 226 (2d Cir.2006)).

sufficiently cohesive to warrant adjudication by representation." [17]

■ Berks alleges that defendants violated Sections 10(b) of the Exchange Act and Rule 10b–5 thereunder as well as controlling person claims under Exchange Act Section 20(a). To succeed on the 10b–5 claims, it must prove (1) a material misrepresentation or omission by defendants, (2) *scienter*, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) transaction causation, (5) economic loss, and (6) loss causation.[18] The Section 20(a) claims require proof of (1) a primary violation of the federal securities laws and (2) control by the defendant over the primary violator.[19]

It is common ground, save for the issue of transaction causation, that Berks's claims are predicated upon a common nucleus of facts and a common course of conduct such that each element necessary to prove defendants' allegedly fraudulent conduct is common to all class members.[20] Defendants, however, contend that individual questions of reliance preclude Berks from satisfying the predominance criterion. Berks responds that it will not have to prove reliance on an individual basis because it can be presumed.

### Reliance

■ Reliance may be presumed where (1) defendants have made material omissions, as indicated by *Affiliated Ute Citizens of Utah v. United States*,[21] or (2) the fraud-on-the-market doctrine applies.[22] Berks seeks to avail itself of both presumptions. Defendants, however, rejoin that Berks is not entitled to either presumption on the ground that it has not demonstrated the materiality of the alleged misstatements and omissions. They argue in the alternative that (1) the *Affiliated Ute* presumption does not apply because this case involves affirmative misrepresentations, not "primarily a failure to disclose," [23] and (2) Berks cannot avail itself of the fraud-on-the-market doctrine because it has failed to demonstrate market efficiency.

■ Our Circuit stated in *In re Salomon Analyst Metromedia Litigation*[24] ("*Salomon Analyst* ") that a plaintiff must demonstrate three elements in order for the fraud-on-the-market presumption to apply: that "a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e., efficient market)." [25] It

**17.** *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

**18.** *See Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008); *In re Parmalat Sec. Litig.,* 2008 WL 3895539, at *7–8; *In re Parmalat Sec. Litig.,* 375 F.Supp.2d 278, 302–03 (S.D.N.Y.2005).

**19.** *See, e.g., In re Parmalat Sec. Litig.,* 2008 WL 3895539, at *7–8; *In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 515 (S.D.N.Y. 2005).

**20.** *See In re Parmalat Sec. Litig.,* 2008 WL 3895539, at *7–8.

**21.** 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

**22.** *In re Parmalat Sec. Litig.,* 375 F.Supp.2d 278, 303 (S.D.N.Y.2005).

**23.** *Affiliated Ute,* 406 U.S. at 153, 92 S.Ct. 1456.

**24.** 544 F.3d 474 (2d Cir.2008).

**25.** *Id.* at 479, 481 (citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 248 n. 27, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The *Basic* Court stated that:

"[t]he Court of Appeals held that *in order to invoke the presumption, a plaintiff must allege and prove:* (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would in-

"h[e]ld that plaintiffs must show that the statement is material (a prima facie showing will not suffice)." [26] As the *Salomon Analyst* court reasoned,

> "[i]f plaintiffs can show that the alleged misrepresentation was material and publicly transmitted into a well-developed market, then reliance will be presumed, for if a reasonable investor would think that the information would have 'significantly altered the total mix of information,' then it may be presumed that, in an efficient market, investors would have taken the omitted information into account, thereby affecting market price." [27]

The *Affiliated Ute* Court likewise held that where a plaintiff's fraud claims are based on omissions, transaction causation may be satisfied so long as the plaintiff shows that the information withheld was material.[28] It is the plaintiff's burden to "establish [ ] the materiality of the omission." [29]

Defendants argue that "[b]ecause plaintiff has failed to produce any evidence of materiality (let alone establish materiality by a preponderance of the evidence), there is no basis for applying a class-wide presumption of reliance." [30] Berks responds that defendants "have tailed to carry their burden of showing that their misstatements and omissions were not material." [31] It argues also that it "has presented proof of the materiality of defendants' misrepresentations and omissions" on the theories that (1) the alleged fraud "impugned the integrity of management, which in itself would be material to investors" under *In re Monster Worldwide, Inc. Securities Litigation*[32] ("*Monster Worldwide*"), and (2) the event study of its expert witness, Dr. R. Alan Miller, "demonstrates the price movements of First American stock were attributable to [defendants'] alleged misstatements or corrective disclosures." [33]

duce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed. Given today's discussion regarding the definition of materiality as to preliminary merger discussions, elements (2) and (4) may collapse into one." *Basic*, 485 U.S. at 248 n. 27, 108 S.Ct. 978 (emphasis added).

26. 544 F.3d at 486 n. 9. While *Salomon Analyst* addressed alleged misstatements by a securities analyst, it held that "no heightened test is needed in the case of research analysts." *Id.* at 484, Its reasoning therefore applies with equal force with respect to issuers.

27. *Id.* at 483 (quoting *Basic*, 485 U.S. at 232, 108 S.Ct. 978) (internal citations and quotation marks omitted); *see also In re Sadia, S.A. Sec. Litig.*, 08 Civ. 9528(SAS), 269 F.R.D. 298, 2010 WL 2884737, at *6 (S.D.N.Y. July 20, 2010). The *Salomon Analyst* court noted also that "[t]he law guards against a flood of frivolous or vexatious lawsuits against third-party speakers because … plaintiffs must show the

materiality of the misrepresentation" on a motion for class certification. *Id.* at 484.

28. *Affiliated Ute*, 406 U.S. at 153–154, 92 S.Ct. 1456, 1472 ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."); *see In re Sadia*, 269 F.R.D. at 307–08, 2010 WL 2884737, at *6.

29. *duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) ("[I]f the plaintiff proves that the facts withheld are material in the sense that a reasonable investor might have considered them important, reliance will be presumed.") (internal citation omitted).

30. Def. Mem. 10.

31. Pl. Reply Mem. 10, 12.

32. 251 F.R.D. 132 (S.D.N.Y.2008).

33. Pl. Reply Mem. 6; Pl. Feb. 24, 2010 letter, at 1.

## A. Management Integrity

■ As an initial matter, there is no merit to Berks's contention that defendants bear the burden of showing that the alleged misstatements and omissions were immaterial. Under *Salomon Analyst* and *Affiliated Ute*, Berks must demonstrate materiality in order to avail itself of a presumption of reliance on misstatements and omissions, respectively.[34] Berks, however, has adduced no evidence that the alleged fraud implicated the integrity of defendants' management. Nor has it shown that alleged mismanagement "would have been viewed by the reasonable investor as having significantly alternated the 'total mix' of information made available." [35]

■ *Monster Worldwide* is consistent with this view. There the district court, as the "factfinder for the limited purpose of th[e] motion for class certification," held that "there is a sufficient showing of materiality as to warrant the application of [a presumption of reliance], at least on the present record." [36] It credited evidence that (1) the issuer's share price had declined eight percent when it was implicated publicly in a stock option backdating scheme, (2) the issuer "tacitly acknowledged" that its financial statements were materially misleading, and (3) its independent auditor "publicly opined" that the issuer had "identified material misstatements in annual financial statements," which were certified by its chairman and chief executive officer.[37] Berks, by contrast, points to no such evidence.[38]

## B. Impact on Share Price

■ Berks rejoins that it has established materiality on the theory that "the First American stock price dropped when the fraud was revealed." [39] It relies upon Dr. Miller's event study,[40] which allegedly

34. *Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456; *Salomon Analyst*, 544 F.3d at 483, 486 n. 9.

35. *Basic*, 485 U.S. at 232, 108 S.Ct. 978; *see In re Sadia*, 269 F.R.D. at 312–14, 2010 WL 2884737, at *10 (finding that plaintiffs satisfied "the 'total mix' standard" on class certification motion, crediting expert event study showing "statistically significant 'unpredicted' decline" in stock price and testimony of each class representative that primary allegation of fraud was "based on [defendant's] failure to disclose the amount of risk [it] undertook ... and that doing so violated its internal hedging policies"); *Monster Worldwide*, 251 F.R.D. at 138 (finding that "there is a sufficient showing of materiality as to warrant the application of *Basic*, at least on the present record," on class certification motion); *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 222–23 (S.D.N.Y.2006) (finding that "plaintiffs have ... made a sufficient showing of materiality" and that defendants "make no serious argument that the alleged misrepresentations were immaterial"), *vacated on other grounds*, 544 F.3d 474 (2d Cir.2008); *see also In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 142–143 & n. 11 (S.D.N.Y.2008) (denying class certification on

basis of finding that plaintiff "failed to make a sufficient showing that [the fraud-on-the-market presumption] is applicable in this particular case.")

Plaintiff's expert witness in fact testified that he was "not retained to and didn't attempt to reach an opinion with respect to materiality." Def. Ex. J, Miller Dep. 37:17–44:16.

36. 251 F.R.D. at 138.

37. *Id.* at 138–39.

38. Berks's reliance upon *Silversman v. Motorola, Inc.*, 259 F.R.D. 163 (N.D.Ill.2009), also is unavailing. *Silversman* is not binding on this Court and, in any event, acknowledges that "*class reliance will be presumed—'if plaintiffs can show that the alleged misrepresentation was material* and publicly transmitted into a well-developed market.'" *Id.* at 174 (quoting *Salomon Analyst*, 544 F.3d at 483) (emphasis added).

39. Pl. Reply Mem. 16.

40. The Court of course recognizes that "plaintiffs do not bear the burden of showing an

showed that the price of First American stock reflected three "corrective disclosures" relating to eAppraiseIT's alleged fraud.

First, the complaint alleges that the NYAG commenced an industry-wide investigation of real estate appraisal practices and issued a subpoena to eAppraiseIT on May 22, 2007.[41] Berks acknowledges that *Bloomberg* on that same day reported the commencement of the investigation and issuance of the subpoena.[42] According to Dr. Miller's event study, First American's shares closed on May 22, 2007 at $52.73, $0.14 less than the price at the moment *Bloomberg* published its article. They opened on May 23, 2007 at $52.60, $0.13 less than the previous day's closing price.[43] Dr. Miller nevertheless opined that "a large price decline would not be expected" because "this news was portrayed by [eAppraiseIT] as positive. eAppraiseIT President Anthony Merlo, Jr. said in the announcement of the subpoena that 'It's a very good thing, what the attorney general is doing. Cuomo's office was focused on who's exerting pressure on the appraisers.' "[44]

Dr. Miller opined that First American's stock price did not decline in response to news of the NYAG investigation until June 7, 2007, when *Bloomberg* reported that "New York Attorney General Andrew Cuomo is investigating pressure on appraisers and has issued at least three subpoenas," including a subpoena to eAppraiseIT.[45] The June 7, 2007 *Bloomberg* article, however, did not report any facts regarding the NYAG's investigation of eAppraiseIT that *Bloomberg* and Merlo had not disclosed publicly sixteen days earlier.[46] I therefore find Dr. Miller's opinion that the market responded to public disclosure of that investigation to be singularly unpersuasive.

Second, Miller opined that First American's share price declined on July 17, 2007 in response to a *Bloomberg* article reporting, according to Miller, that the real estate firm Mitchell, Maxwell & Johnson had "changed its appraisal practices as a result of the State's probe."[47] The portion of the article cited by Miller, however, disclosed no new information regarding the NYAG's investigation of eAppraiseIT. It merely reported that eAppraiseIT "ha[d] publicly acknowledged receiving a subpoena," a

impact on price" in order to invoke a presumption of reliance. *Salomon Analyst*, 544 F.3d at 483 (holding that plaintiff need only meet *Basic's* "total mix" standard). It recognizes also that our Circuit "ha[s] consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation" and that "it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Nevertheless, Berks attempts to establish the materiality of the alleged misstatements and omissions on the basis of their alleged affect on First American's share price, as "stock movement is a factor the jury may consider relevant" in assessing materiality. *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991).

**41.** Am Cpt. ¶ 136.

**42.** Def. Ex. C; Am. Cpt. ¶¶ 83–84; 136–37.

**43.** Miller 2d Aff. ¶ 10.A, at 8–9.

**44.** *Id.* at ¶ 10.B.

**45.** *See also* Am. Cpt. ¶ 89 ("[T]he increased scrutiny on the industry finally began to take its toll on First American's stock price.").

**46.** Miller 2d Aff. ¶ 10.B, at 9. While the article apparently reported also that Ohio Attorney General had brought suit against several real estate companies that allegedly "pressured appraisers to inflate home values," plaintiff does not assert that the lawsuit concerned any of the defendants here or that news of the alleged "pressure [] on appraisers" was new to the market.

**47.** *Id.* at ¶ 10.C.

fact that had been disclosed publicly six weeks earlier.[48]

Third, the complaint alleges that the NYAG on November 1, 2007 brought suit against First American, "revealing an illegal appraisal inflation scheme with WaMu."[49] Berks acknowledges that the lawsuit was disclosed to the market on that day.[50] Dr. Miller nevertheless opined that the market did not respond to news of the lawsuit until November 7, 2007, when Fannie May issued a statement that it was "concerned about the allegations" of the NYAG's complaint against First American because, "[i]f true, the appraisal practices described in the complaint would violate Fannie Mae's requirements for loans we purchase from lenders or securitize."[51] Fannie Mae's announcement, however, disclosed no new information regarding defendants. In consequence, Dr. Miller's opinion is unconvincing.[52] The Court rejects his study as a basis for a finding of materiality.

The fact that public disclosure of the NYAG's investigation and lawsuit had no significant effect on the price of First American stock is not surprising. eAppraiseIT was only one of First American's approximately 450 subsidiaries.[53] The $50 million in revenue that eAppraiseIT derived from its relationship with WaMu in 2006 and 2007 represented only 0.3 percent of First American's total revenue in those years.[54] Even Berks's own financial advisor conceded that eAppraiseIT's performance "did not materially figure into a decision" whether to invest in First American on Berks's behalf.[55]

 In the last analysis, Berks has not demonstrated that defendants' alleged misstatements and omissions were material. It therefore cannot avail itself of a presumption of reliance under either the fraud-on-the-market doctrine or *Affiliated Ute*. In consequence, issues subject to individualized proof would predominate over common issues with respect to each of Berks's claims.[56]

## Conclusion

For the foregoing reasons, the motion for class certification [DI 51] is denied.

SO ORDERED.

---

**48.** According to the amended complaint, eAppraiseIT publicly acknowledged its receipt of the subpoena on June 4, 2007. Am. Cpt. ¶ 87.

**49.** Am. Cpt. ¶ 96.

**50.** *Id.* ¶¶ 96–97.

**51.** Miller 2d Aff. ¶ 10.E, at 12.

**52.** In the alternative, the Court credits the opinion of defendants' expert witness, Dr. Allan W. Kleidon, that there is "no evidence" that any of the alleged misrepresentations resulted in an "immediate increase" in First American's stock price and "no evidence" that any corrective disclosure "caused an im-

mediate decrease" in stock price. Kleidon Aff. ¶¶ 49, 65.

**53.** Def. Ex. A, 2006 10–K Ex. 21 ("Subsidiaries of the Registrant"); Def. Ex. B, 2007 10–K Ex. 21 (same).

**54.** *See* Kleidon Decl. Ex. 3.

**55.** Def. Ex. E, Peterson Dep. 68:14–69:8, 74:16–19.

**56.** It therefore is not necessary to address defendants' alternative arguments with respect to predominance and typicality.