**Eugene duPONT III,**
**Plaintiff-Appellant,**

v.

**Edward J. BRADY and Brady & Tarpey,**
**P.C., Defendants-Appellees.**

**No. 1043, Docket 87–7198.**

United States Court of Appeals,
Second Circuit.

Argued April 27, 1987.

Decided Sept. 8, 1987.

Michael E. Schoeman, New York City (Thomas J. Dolan, Schoeman, Marsh, Updike & Welt, New York City, of counsel), for plaintiff-appellant.

Anthony P. Colavita, L'Abbate & Balkan, Garden City, N.Y., for defendants-appellees.

Before FEINBERG, Chief Judge, and KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The principal issue before us, one of first impression, is which party bears the burden of persuasion on the issue of a plaintiff's reliance or nonreliance on a defendant's material omissions under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5

promulgated thereunder, 17 C.F.R. § 240.-10b–5 (1986). We conclude that, once the plaintiff establishes the materiality of the omission by a preponderance of the evidence, the burden shifts to the defendant to establish also by a preponderance of the evidence that the plaintiff did not rely on the omission in making the investment decision. We therefore reverse and remand.

## BACKGROUND

Eugene duPont III commenced this action on July 11, 1985 in the Southern District of New York against his former lawyer, Edward J. Brady, and the law firm of Brady & Tarpey ("B & T"). DuPont claimed that the defendants had defrauded him with respect to his investment in the Kenona Coal Program limited partnership ("Kenona"), in violation of the federal securities laws, New York's Martin Act, N.Y. Gen.Bus.Law § 352–c (McKinney 1984), and the common law of fraud and attorney malpractice. A bench trial was held before Judge Sand in September 1986. The district court's opinion is reported at 646 F.Supp. 1067 (S.D.N.Y.1986).

The evidence established that Brady was duPont's personal lawyer from 1956 to 1980 and frequently advised duPont on tax matters. Brady also assisted duPont with a number of investments, several of which served as tax shelters.[1] One such tax shelter investment originated at a meeting in late 1979, when duPont was informed by his financial advisers at the Southern National Bank of Houston that his potential tax exposure exceeded his available funds. In response, Brady, who was also present at the meeting, advised duPont to invest in a tax shelter that would allow him to avoid tax on at least $300,000 of income.

Brady then instructed Daniel Gaven, an associate at B & T, to assist in finding a suitable tax shelter for duPont. Brady and Gaven identified two such ventures, one of which was Kenona, a coal mining shelter.

The promoters of both tax shelters had promised to pay a commission to B & T if any client of the firm invested in their program. Brady and Gaven ultimately determined that the Kenona program was better suited to duPont's financial needs.

Investors who purchased limited partnership interests in Kenona were promised tax deductions of as much as four times the amount of their cash contributions. These tax benefits were to be provided by two features of the Kenona program. First, limited partners were to furnish recourse notes to an "insurance reserve fund" designed to protect the general partner against massive accident claims. These notes would be included in each limited partner's basis in Kenona even though they would become payable only in the remote event that claims exceeded the highest coal mining accident judgment ever reported. Second, the limited partners were to deduct a full year of "minimum royalty payments" in 1979, the first year of the program, even though coal mining operations were not to begin until November of that year. The minimum royalty payments were to be financed primarily out of nonrecourse loans on which the limited partnership would have to make payment only if the mine actually produced coal. The private placement memorandum on Kenona included a favorable tax opinion prepared by the law firm of Mirrer, Lerner & Ryan.

Gaven had previously reviewed the private placement memoranda on similar coal programs offered by the same promoter and the relevant legal authorities on the tax benefits of such programs. He had spoken both with an agent of the promoter and with the author of the tax opinion letter. He concluded that, although the Internal Revenue Service ("IRS") was likely to deny deductions for tax shelters like Kenona, the Tax Court ultimately would allow the deductions. Brady reached the

---

1. For example, duPont sought advice on schemes to generate tax savings from the publication of a book about his brother, from the construction of a lake and a granary on his property, and from charitable contributions to two institutions that later sent him on African safaris. In addition, Brady advised duPont on tax shelter investments, which resulted in duPont's earlier participation in two limited partnerships that produced substantial tax benefits.

same conclusion after consulting with Gaven and examining the tax opinion letter.[2]

Gaven forwarded the Kenona private placement memorandum and subscription documents to duPont on or about November 8, 1979. DuPont promptly purchased three units in the Kenona limited partnership for $75,000 with a check dated November 13, 1979. He also contributed a $225,000 promissory note, dated November 12, 1979, to fund the insurance reserve.

DuPont executed the subscription documents without reading the tax opinion or any other portion of the private placement memorandum. He therefore did not see a sentence in the memorandum stating that a fifteen percent commission would be paid to "Professional Advisors of Investors and to Persons Introducing Investors to the Partnership." Neither Brady nor anyone else at B & T otherwise notified duPont that the firm would receive a commission if he invested in Kenona. Furthermore, duPont was not informed of Brady's and Gaven's opinion that Kenona's tax benefits would be disallowed by the IRS although ultimately allowed by the Tax Court.

DuPont claimed a $300,000 deduction for his Kenona investment on his federal income tax return for 1979. The IRS disallowed the deduction in 1985. DuPont settled the matter in 1986 by agreeing to pay a tax deficiency of $140,513 plus interest. Because mining never began, the investment was worthless.

DuPont contends in this action that the defendants violated the federal securities laws, the Martin Act, and New York common law by failing to inform him of the commission that B & T would earn as a result of his investment in Kenona and of Brady's belief that the IRS would challenge tax deductions attributable to Kenona.

Judge Sand found that Brady had failed to convey material information to duPont when "neither [Brady] nor his associate Gaven disclosed to their client their understanding that the IRS might well disallow the deduction [for Kenona] prior to tax court review." 646 F.Supp. at 1072. In addition, Judge Sand found that "Brady's failure to disclose B & T's fifteen percent commission was a material omission." Id.[3] He also found that Brady had acted with recklessness sufficient to satisfy the scienter element of a claim under Section 10(b) and Rule 10b–5. Id. at 1073.

Judge Sand nonetheless denied recovery because duPont had "failed to establish by a preponderance of the evidence that he relied to his detriment on any omission or misrepresentations that defendant Brady made in connection with plaintiff's investment in the Kenona Coal Program." Id. at 1072. Given "duPont's history of aggressive and comparable investing solely for tax avoidance purposes" and his "need to locate a tax shelter on very short notice and late in the tax year (a time at which there were apparently few suitable investments)," Judge Sand concluded that duPont would have invested in Kenona even if he had known of the commission arrangement and the risk of nondeductibility. Id. at 1074. Judge Sand stated that "the summary fashion in which duPont approached the

---

2. The district court concluded that

> based on the law as it existed in 1979, no reasonable and experienced tax lawyer could have issued a favorable opinion on either the deductibility of the optional capital contribution [to the insurance reserve fund] (based on the "at risk" rule) or the annual minimum royalty (because it would be paid only if there was actual production from the mine).

646 F.Supp. at 1070–71. The court nonetheless held that, although it was unreasonable for the Mirrer firm to render a favorable opinion on Kenona, "Brady's opinion, based in large part on the material provided him, was colorable, and genuinely held." Id. at 1071. These findings are not challenged on appeal.

3. Judge Sand rejected the defendants' claim that they could not be held liable for failing to disclose the commission arrangement because the private placement memorandum stated that commissions would be paid to those who introduced investors to Kenona. He concluded that the defendants should have disclosed the commission arrangement to duPont notwithstanding the statement in the memorandum, both because the statement was "so ambiguous that it failed to indicate effectively whether Brady or his firm fell within its breadth" and because "Brady should have known that duPont would not read the placement materials." Id. at 1072.

entire investment, with barely a cursory inquiry into the tax risks, and ... hardly a glance at the placement materials," further demonstrated that duPont would not have relied on Brady's undisclosed opinions concerning the tax risks of the investment. *Id.* DuPont's claims under the Martin Act and the common law of fraud and attorney malpractice were rejected on similar grounds.[4] *Id.* at 1074–75.

## DISCUSSION

The Supreme Court has held that "positive proof of reliance is not a prerequisite to recovery" on a Rule 10b–5 claim involving a failure to disclose. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Instead, if the plaintiff proves that "the facts withheld [are] material in the sense that a reasonable investor might have considered them important," *id.* at 153–54, 92 S.Ct. at 1472, reliance will be presumed. We have recognized that such a presumption is appropriate because "in instances of total non-disclosure, ... it is of course impossible to demonstrate reliance." *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).

A number of courts have since held that this presumption of reliance is not conclusive. *See, e.g., Michaels v. Michaels,* 767 F.2d 1185, 1200 (7th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *Rifkin v. Crow,* 574 F.2d 256, 262 (5th Cir.1978); *Chelsea Associates v. Rapanos,* 527 F.2d 1266, 1271–72 (6th Cir.1975); *Rochez Bros. v. Rhoades,* 491 F.2d 402, 410 (3d Cir.1974), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). These courts have held, however, that proof of the materiality of an omission merely shifts the burden of persuasion on the issue of reliance. It is thus the defendant who must prove by a preponderance of the evidence that "even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was." *Rochez Bros.,* 491 F.2d at 410; *see also Rifkin,* 574 F.2d at 262

("If defendant can prove that plaintiff did not rely, that is, that plaintiff's decision would not have been affected even if defendant had disclosed the omitted facts, then plaintiff's recovery is barred.").

We agree that a defendant can avoid liability under Rule 10b–5 for nondisclosure of material information by proving by a preponderance of the evidence that disclosure of that information would not have altered the plaintiff's investment decision. Once materiality and the defendant's scienter are proven, it may be safely presumed that the plaintiff's investment decision would have been influenced by knowledge of the omitted facts. The finding of materiality by its very nature establishes that the information omitted would have been considered important by investors generally. It thus will be only the unusual case in which compatible findings of materiality and nonreliance can be made. Under those circumstances, burdening plaintiffs with having to prove the generally indeterminable fact of what would have happened but for the omission would reduce the protection against fraud afforded by Section 10(b). We believe, therefore, that defendants should be made to bear the greater part of the risk of mistaken adjudications. Given the scienter finding, they are established wrongdoers, and their wrongful conduct will generally have contributed to the uncertainty about the plaintiff's likely reaction to the undisclosed information. Even defendants who have acted wrongfully, however, should not be made to pay for damage they did not cause. The presumption therefore shifts only the burden of persuasion. Because proof of nonreliance will generally be quite difficult, we perceive no reason to impose a higher burden than proof by a preponderance of evidence.

Under this analysis, which we set forth for the first time in this Circuit, the district court appears not to have allocated this burden of persuasion properly in the instant case. First, in the introduction to his conclusions of law, Judge Sand stated

---

**4.** Judge Sand's decisions with regard to the common law claims are not challenged on appeal.

that "plaintiff has failed to establish by a preponderance of the evidence that he relied to his detriment on any omissions or misrepresentations that defendant Brady made." 646 F.Supp. at 1072. Second, after explaining why he found the presumption of reliance to have been rebutted in the instant case, Judge Sand stated that "plaintiff has failed to show that defendant's actions caused him harm." *Id.* at 1074. Third, in rejecting duPont's claim of attorney malpractice, Judge Sand stated that "as is the case with respect to each of duPont's claims, plaintiff has failed to establish by a preponderance of the evidence that Brady, by his omissions, caused duPont's loss." *Id.* at 1076. Finally, in the conclusion to his opinion, Judge Sand stated that "plaintiff has failed to sustain his burden of proof with respect to ... any alleged violations of the federal securities laws." *Id.*

Accordingly, we reverse and remand to the district court for a determination of whether the defendants proved duPont's nonreliance on their material omissions by a preponderance of the evidence. We reject duPont's contention that any finding of nonreliance upon the proper allocation of the burden of proof would be clearly erroneous. The evidence does not conclusively support either party's version, and much of the ultimate conclusion depends on credibility findings. Judge Sand is thus in no way foreclosed from holding on remand that the defendants either did or did not meet their burden of persuasion on this issue.[5]

Reversed and remanded for further proceedings.

---

5. We need not decide whether the burden of persuasion as to reliance or nonreliance on a material omission also shifts to the defendant under the Martin Act. If it does, duPont would be entitled to no relief under the Martin Act that he would not already be entitled to under Rule 10b–5. If it does not, duPont is likewise entitled to no relief under the Martin Act, because the district court's finding that he failed to prove reliance on the defendants' omissions was not clearly erroneous.