Nahum MANELA, Rosane Manela, and Eva Goldman, Plaintiffs,

v.

GARANTIA BANKING LIMITED and Garantia, Inc., Defendants.

No. 96 Civ. 0139(LAK).

United States District Court, S.D. New York.

May 7, 1998.

---

David W. Rivkin, Eric J. Grannis, Debevoise & Plimpton, New York City, for Plaintiffs.

Danforth Newcomb, Margaret A. Helen Macfarlane, Mary K. Warren, Shearman & Sterling, New York City, for Defendants.

## OPINION

KAPLAN, District Judge.

Nahum Manela, Rosane Manela, and Eva Goldman here sue Garantia Banking Limited ("GBL") and Garantia, Inc. ("GI") to recover in excess of $20 million in damages as a result of defendants' sales and purchases of plaintiffs' securities. The case is now before the Court on defendants' motion for summary judgment.

1. Macfarlane Decl. Ex. 1, Nahum Manela Dep. ("Manela Dep.") 40–43; *id.* Ex. 2.

2. Goldman Decl. ¶ 1; Rosane Manela Decl. ¶ 1.

3. Figueiredo Aff. ¶ 2.

4. Pretrial Order at 10, ¶ 4.

5. Figueiredo Aff. ¶ 2

6. Pretrial Order at 25, ¶ 11.

7. *Manela v. Garantia Banking Ltd.*, 940 F.Supp. 584 (S.D.N.Y.1996).

*Facts*

### The Parties

Plaintiff Nahum Manela ("Manela") is the founder, former president, and controlling shareholder of DeMillus, a large Brazilian manufacturer of women's undergarments.[1] Plaintiffs Rosane Manela and Eva Goldman are his daughter and niece, respectively.[2]

GBL is a Bahamian company with its principal place of business in Sao Paulo, Brazil,[3] and GI is a Delaware corporation with its principal place of business in New York City.[4] GBL, which has no employees or office of its own, is a wholly-owned subsidiary of Banco de Investimentos Garantia, S.A. ("BIG"), Brazil's largest investment bank, and pays BIG an annual fee for the services of some 25 BIG employees in Sao Paulo who conduct an investment banking business with GBL's clients.[5] GI is an indirect wholly-owned subsidiary of BIG and a registered broker-dealer under the Securities Exchange Act of 1934.[6]

### Manela's Relationship With Defendants

As the facts and the contentions of the parties are outlined in the Court's previous opinion,[7] the Court will confine itself here to a summary of the events of immediate significance to defendants' motion.

At the suggestion of a GI employee named Marcello Stallone, Manela opened a margin trading account with GBL in August 1994 for the purpose of trading in Brazilian Brady bonds.[8] Rosane Manela and Eva Goldman signed the account application as "Joint Account Holders."[9] Manela deposited his ex-

8. Nahum Manela Decl. ("Manela Decl.") ¶¶ 4, 8.

Brady bonds are bonds issued by developing countries under a plan formulated by then-Secretary of the Treasury Nicholas Brady. Manela Dep. 7; Macfarlane Decl. Ex. 9, ¶¶ 3–4. The bonds at issue in this case do not trade on American securities exchanges. Burstin Decl. ¶ 8. Transactions in the bonds in which plaintiff invested are cleared through an entity called Euroclear and other European clearing corporations. Figueiredo Aff. ¶ 13.

9. Goldman Decl. ¶ 2; Rosane Manela Decl. ¶ 2.

isting investment in Brady bonds,[10] which had a face value of $16 million, into his GBL account with the intention of increasing his Brady bond position.[11] He borrowed against the bonds and other collateral on deposit with GBL to finance further purchases.[12]

At the time of the first loan and again with each subsequent loan, GBL sent a form agreement to Manela (the "Loan Agreements")[13] although none of these Loan Agreements ever was signed by the plaintiffs.[14] The Loan Agreements provided that GBL would finance 70 percent of the bonds' purchase price, with the bonds themselves serving as collateral.[15] The margin provisions of the Loan Agreements provided that if the ratio of the loan amount to the market value of the Brady bond collateral exceeded 80 and later 85 percent, plaintiffs would be required to deposit additional collateral or prepay part of the loan so that the ratio would be restored to 70 percent.[16] The term of each loan, according to the Loan Agreements, was one month,[17] although plaintiffs contend that the parties intended that the loans be renewed to permit plaintiffs to hold the bonds as long as Manela desired.[18] The loans in fact were renewed monthly during 1994 and part of 1995.[19]

Manela had a significant investment also in a GBL-managed fund entitled the Garantia Debt Fund ("GDF").[20] Manela alleges that he made this investment at the urging of Stallone, who purportedly told Manela that the GDF investment could be used "like cash" to deal with any margin call.[21]

By December 1994, Manela held Brady bonds with a face value of approximately $270 million.[22] At that time, however, the market for Brady bonds was in turmoil due to the Mexican peso crisis that began in late December 1994.[23] On January 9, 1995, the market value of these Brady bonds fell to a point at which the ratio of the loan amounts to the market value of the collateral exceeded 85 percent.[24] Defendants contend that the ratio exceeded 90 percent on January 10.[25] In response, GBL, without immediately notifying Manela, extended credit against Manela's investment in the GDF, in order to reduce the ratio, to the extent of over half the value of his GDF holdings.[26] According to defendants, this succeeded in lowering the ratio only to 79.28 percent.[27]

*The Sales on January 11, 1995*

At 8:00 a.m. on January 11, Stallone contacted Manela and informed him that the market value of his Brady bonds had fallen to a point at which the value of his collateral was below the stipulated ratio.[28] He told Manela that Manela therefore would have to make a deposit to prepay a portion of the loans, failing which GBL would sell a portion of Manela's collateral in order to reduce the ratio to 70 percent.[29]

---

10. Manela's original deposit with GBL included some Brady bonds that were not series C Brazilian Brady bonds, although all subsequent purchases were of Brazilian C bonds. Manela Decl. Ex.2. All of the bonds are referred to as Brady bonds without differentiation.

11. Manela Decl. ¶ 10.

12. *Id.* ¶ 9; Manela Dep. 103.

13. Manela Decl. ¶ 9; Manela Dep. 100–03.

14. Manela Dep. 100; Manela Decl. ¶ 17.

15. Manela Decl. ¶ 9; Manela Dep. 103.

16. The threshold was increased from 80 percent to 85 percent in December 1994. Manela Decl. ¶ 9.

17. Manela Dep. 103–04.

18. Manela Decl. ¶ 17.

19. *Id.* ¶ 16.

20. *Id.* ¶ 15.

21. *Id.*

22. *Id.* ¶ 13.

23. Burstin Decl. ¶ 22.

24. Tonnani Decl. ¶ 11; Manela Decl. ¶ 18.

25. Tonnani Decl. ¶ 12.

26. Manela Decl. ¶ 18; Macfarlane Decl. Ex. 22, Hime Dep. 200–02.

27. Tonnani Decl. ¶ 13.

28. Manela Decl. ¶ 19.

29. *Id.*

Manela expressed disbelief that a margin call had occurred at the then current market price of Brady bonds and refused to authorize Stallone to sell his bonds to meet the margin call.[30] He did suggest, however, that the GDF investment be used if necessary to meet the margin call—which prompted disclosure of the fact that GBL already had extended credit against the GDF investment for Manela's account on the previous day.[31] Finally, Manela asked Stallone to delay the liquidation of any collateral while Manela checked with Republic National Bank ("RNB") in Zurich to determine whether he could liquidate other holdings.[32] A short time later, Manela called Stallone back and told him that it would take several days to liquidate other holdings.[33] He asserts also that he obtained Stallone's promise that any liquidation of Manela's collateral would be done slowly, in small tranches.[34]

At approximately 9:00 a.m., Stallone called Manela again and informed him that GBL had sold $45 million face value of Manela's Brady bonds at an average price of 35.5 percent.[35] Stallone later revised this statement to indicate that $50 million face value of bonds had been sold.[36]

### The January 12, 1995 Purchase

At 9:00 a.m. the next morning, Stallone called Manela to report that Brady bond values had risen to 40.5 percent.[37] The resulting increase in the value of Manela's position meant that he again was able to make financed purchases of Brady bonds, and he instructed Stallone to replenish his position to the maximum extent possible.[38] Stallone argued against doing so, at least initially.[39] Manela responded that he had made up his mind to buy.[40] Stallone then reported that he had located a block of Brady bonds with a face value of $40 million and that the price for this block was 43.25 percent.[41] Although he was surprised by this price, Manela instructed Stallone to purchase the block.[42]

Manela claims that he was unaware at that time that the block was being sold to him out of GBL's own holdings.[43] Stallone claims that he disclosed GBL's ownership at the time.[44]

### Subsequent Events

Manela received written confirmation of the January 11 sale of his bonds approximately one week later.[45] Prior to this instance, Manela asserts, confirmations always had been issued the day after a transaction took place.[46]

By January 19, Manela was concerned that the loan to value ratio in fact had not exceeded 85 percent on January 11.[47] On January 27, Manela wrote a letter to GBL's president, Claudio Haddad, protesting the January 11 sale.[48] Haddad responded by asserting that Manela had consented to the January 11 sale.[49] Manela contends also that Haddad told him that he must repay the entire amount of his outstanding loans, in the approximate amount of $100 million, by the

30. *Id.* ¶ 20; Manela Dep. 222–23.

31. Manela Decl. ¶ 19.

32. *Id.* ¶ 20.

33. *Id.* ¶ 22.

34. *Id.*

35. *Id.* ¶ 23. The bonds were priced as a percentage of their principal amount.

36. *Id.*

37. *Id.* ¶ 25.

38. *Id.*

39. *Id.* ¶ 26; Manela Dep. 265; Macfarlane Decl. Ex. 20, Stallone Dep. ("Stallone Dep.") 315.

40. Manela Decl. ¶ 26; Manela Dep. 265; Stallone Dep. 315.

41. Manela Decl. ¶ 26; Stallone Dep. 316–21.

42. Manela Decl. ¶ 26.

43. *Id.*

44. Stallone Dep. 317.

45. Manela Decl. ¶ 29.

46. *Id.*

47. Manela Dep. 309.

48. *Id.* at 310; Manela Decl. Ex. 14.

49. Manela Decl. Ex. 16.

next day or that GBL would liquidate his holdings.[50] According to defendants, approximately $102 million in loans from GBL to Manela became due and owing on February 1, 1995.[51]

The parties met to address Manela's complaints on February 8, 1995 at BIG's Sao Paolo headquarters. GBL was represented by Haddad. BIG was represented by Reynaldo Figueiredo, head of BIG's private banking group, and Mario Cesare de Andrade, whom Manela described as a partner in BIG and Figueiredo described as an attorney employed by BIG. Stallone attended the meeting as well.[52] According to Manela, Haddad had stated in a previous phone call that GBL would not rescind the January 11 sale and, further, that GBL would call Manela's loans and sell his collateral unless Manela released all claims he might have against GBL arising out of the January 11 sale.[53] At the February 8 meeting, defendants presented Manela with a release and demanded that he sign, failing which they would withdraw financing.[54] Manela did not execute the release.[55]

On March 8, 1995, Manela received a fax from GBL warning that GBL would sell his bonds by March 15, 1995 to pay off his allegedly overdue loans unless Manela repaid all indebtedness prior to that date or transferred his account to another institution.[56] Manela asserts that, despite the March 15 deadline, GBL proceeded to sell off approximately $65 million in face value of his bonds between March 8 and March 10 without his consent.[57] Manela subsequently transferred his remaining holdings, consisting of $225 million in face value of Brady bonds, to Morgan Stanley, which then liquidated $71 million in face value of the bonds because it was unwilling to finance plaintiffs' position to the same extent as had GBL.[58]

*The Claims and the Motions*

Plaintiffs have asserted a broad array of claims arising out of these facts. Manela makes a series of claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[59] and Rule 10b–5 thereunder[60] as well as on the theory of common law fraud. He contends that defendants lied when they claimed on January 11 that the loan to value ratio had risen above 85 percent. He next asserts that defendants misrepresented the manner in which the bond sale would be executed on January 11 by falsely stating that they would sell in small tranches. He alleges that defendants failed to disclose that the seller of the bonds purchased by Manela on January 12 was GBL rather than a third party. He charges that defendants dishonestly led him to believe that the price at which Manela purchased the bonds on January 12 was the current market price. He contends that defendants falsely stated that they would not begin to sell off Manela's bonds in order to satisfy the loans until March 15. Finally, plaintiffs argue that defendants falsely promised that the monthly loans would be renewed automatically to enable Manela to hold the bonds until maturity in 2014. Substantially the same facts are relied upon in support of a number of other common law claims including breach of contract, breach of fiduciary duty, negligence, conversion, and unjust enrichment.

Defendants seek summary judgment on substantially all of these claims.

*Discussion*

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[61] It is warrant-

---

50. Manela Decl. ¶ 37.

51. Macfarlane Decl. Exs. 34, 36.

52. Manela Decl. ¶ 40.

53. *Id.* ¶ 36.

54. *Id.* ¶ 42.

55. *Id.* ¶ 43.

56. Macfarlane Decl. Ex. 42.

57. Manela Decl. ¶ 45.

58. *Id.* ¶ 47.

59. 15 U.S.C. § 78j.

60. 17 C.F.R. § 240.10b–5.

61. FED. R. CIV. P. 56(c).

ed where the undisputed facts show that the plaintiff cannot establish an essential element of a claim on an element as to which it bears the burden of proof.[62] In such circumstances, "any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment."[63]

### The Securities Fraud Claims

1. *The Elements of a Securities Fraud Claim Under Section 10(b) and Rule 10b–5*

 In order to establish a claim of securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must prove: (1) a misrepresentation of or failure to disclose a material fact, (2) made in connection with the purchase or sale of any security, (3) with scienter, (4) reliance by the plaintiff upon the misrepresentation or omission, (5) and a loss caused thereby.[64] Reliance "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."[65] The allocation of the burden of proof on reliance, however, "may vary depending on whether the claim alleges fraudulent representations or fraudulent omissions."[66] In cases involving misrepre-

sentations, the plaintiff has the burden of demonstrating "that he or she relied on the misrepresentation when entering the transaction that caused him or her economic harm."[67] In cases involving omissions, on the other hand, the Supreme Court held in *Affiliated Ute Citizens of Utah v. United States,* [68] that

> "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." [69]

But *Affiliated Ute* did not entirely eliminate the reliance element even in omission cases.[70] "Although the plaintiff need not prove reliance in 'omission' cases, . . . lack of reliance is a defense. In short, the effect of *Ute* is simply a shift in the burden of going forward on the reliance issue." [71] This presumption "relieves the plaintiff in certain circumstances of the necessity of proving affirmatively that he relied on a misrepresentation." [72] However, " 'once the plaintiff es-

---

62. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir. 1992), *cert. denied,* 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993).

63. *Burke,* 981 F.2d at 1379 (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11–12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam)).

64. *See, e.g., In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 264 (2d Cir.1993), *cert. denied sub nom. Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *Burke,* 981 F.2d at 1378.

65. *Basic, Inc. v. Levinson,* 485 U.S. 224, 242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

66. *Burke,* 981 F.2d at 1378.

67. *Id.* (citations omitted).

68. 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)

69. *Id.* at 153–54, 92 S.Ct. 1456 (citations omitted); *see also Burke,* 981 F.2d at 1379; *duPont v. Brady,* 828 F.2d 75, 78 (2d Cir.1987).

70. IX LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 4392 (1992) (hereinafter "LOSS") ("*Ute* by no means forecloses all consideration of reliance").

71. *Id.; see, e.g., duPont,* 828 F.2d at 78; *Michaels v. Michaels,* 767 F.2d 1185, 119–1200 (7th Cir. 1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *Carras v. Burns,* 516 F.2d 251, 257 (4th Cir.1975); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir.1973); *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981) (*en banc* ), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983) (plaintiff's admission that he did not read or otherwise rely on offering circular enough to rebut presumption of reliance).

72. 4 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG AND LOWENFELS ON SECURITIES FRAUD & COMMODITIES FRAUD §§ 15.07(251), 15:179 (2d ed.1997) (hereinafter "BROMBERG").

tablishes the materiality of the omission . . ., the burden shifts to the defendant to establish . . . that the plaintiff did not rely on the omission in making the investment decision.' "[73] Thus, the presumption of reliance may be rebutted.

### 2. The Alleged Misrepresentation Preceding the January 11 Sale

■ Defendants' opening salvo targets the claim that defendants violated Section 10(b) and Rule 10b–5 by misrepresenting to Manela that a margin call occurred on January 11, 1995.[74] Defendants argue that they are entitled to summary judgment on this claim because plaintiffs cannot demonstrate reliance.

Defendants rely on Manela's own version of the events of January 11. Manela states that he was told by Stallone during the initial phone call that the price of Brady bonds was 34.5 percent and that Manela's account had reached the point of a margin call.[75] Manela says he believed that the price had to fall farther than 34.5 percent in order to trigger a margin call and that he was surprised by Stallone's assertion.[76] After checking with RNB, Manela spoke with Stallone again, was informed once more that the account had reached the point of a margin call, and was told further that GBL would begin selling his bonds if he did not immediately raise funds.[77] Manela responded that if GBL wished to execute a margin call, he could not stop it.[78] In his deposition, Manela explained that he simply did not believe Stallone's representation that his account had reached the point of a margin call and that he therefore did not authorize GBL to sell:

"I felt number one, I am not in the margin call. Number two, the way he is talking to me, he shows insecure and nervous . . . . *And I was careful enough to say, I don't authorize you to sell.* If you have to sell, you don't have to call for my authorization and I don't have money to go and stop you." [79]

Taking these facts to be true for purposes of the motion, defendants argue that no reasonable juror could conclude that Manela relied on Stallone's alleged misrepresentation, that he was deceived by it, or that he entered into any transaction as a result of it.

Plaintiffs nonetheless contend that their 10b–5 claim based on the January 11 sales is sufficient. They posit that churning and unauthorized trading by brokers is actionable and reason from that premise that reliance is unnecessary, at least in the broker-customer context. But while churning and, in some circumstances, unauthorized trading have been held to violate Rule 10b–5,[80] the cases do not justify a Rule 10b–5 claim where, as here, the defendant has established out of the plaintiff's own mouth that the plaintiff was not deceived.

■ Churning occurs when a broker, with intent to defraud, "abuses his customer's confidence . . . by inducing transactions in the customer's account which are disproportionate to the size and character of the account." [81] As Judge Conner so aptly put it, the gravamen of the claim is the use of the broker's authority over the account to generate excessive commissions "while at the same time leading his customer to believe that he is attempting to fulfill the customer's investment objectives." [82] Such cases are entirely in harmony with the reliance requirement whether churning is viewed as a deceptive

---

**73.** *Burke,* 981 F.2d at 1379 (quoting *duPont,* 828 F.2d at 76); *see also* BROMBERG § 15.07(251), 15:179; *cf. Basic, Inc.,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (presumption of reliance may be rebutted in fraud on the market context).

**74.** Manela Decl. ¶¶ 19–24.

**75.** *Id.* ¶¶ 19, 20.

**76.** *Id.* ¶ 20.

**77.** *Id.* ¶ 22.

**78.** *Id.*

**79.** Manela Dep. at 233 (emphasis added).

**80.** *Armstrong v. McAlpin,* 699 F.2d 79, 90 (2d Cir.1983) (churning); *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1069 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978) (churning); VIII LOSS 3780–81 (unauthorized trading).

**81.** *Newburger & Loeb & Co.,* 563 F.2d at 1069.

**82.** *Pross v. Baird Patrick & Co.,* 585 F.Supp. 1456, 1460 (S.D.N.Y.1984).

device[83] or in more traditional fraud terms. The reliance requirement is satisfied either because reliance is presumed under *Affiliated Ute Citizens* in consequence of the broker's failure to disclose the nature, extent and reasons for the trading[84] or because the customer is misled overtly by the broker as to the reasons for the trades.[85]

The status of unauthorized trading under Rule 10b–5 is less clear. But even plaintiffs concede that the mere making of an unauthorized trade is not actionable under the rule absent deception.[86] Contrary to their argument, however, detrimental reliance is essential to their cause of action.[87]

The cases relied upon by the plaintiffs require no different result. *Cruse v. Equitable Securities of New York, Inc.,*[88] which they cite for the proposition that unauthorized trading violates Rule 10b–5 irrespective of any reliance, in fact was decided on the basis that the broker was under a duty to disclose the trading and that the failure to do so was a material omission that gave rise to a presumption of reliance under *Affiliated Ute.*[89] *Bischoff,*[90] another unauthorized trading

case, also was analyzed as an omission case.[91] And *SEC v. Hasho*[92] was brought by the Securities and Exchange Commission, which is not obliged to establish reliance.

Undaunted, plaintiffs assert that it would be unfair to dismiss the Rule 10b–5 claim. They argue that had Manela been deceived by Stallone's alleged misrepresentation, and therefore consented to the sale, there would be no difficulty in demonstrating reliance. Plaintiffs suggest that it would be perverse to deny this claim simply "because [Manela] was not hoodwinked and because Garantia sold the bonds on its own." On the contrary, however, this is precisely the result that should follow in this situation. The core of a Rule 10b–5 claim is fraud. If, as here, there is no fraud, there is no claim.

### 3. The January 11 Sales

■ Plaintiffs' second securities fraud claim is the allegation that Stallone made a material misrepresentation on the morning of January 11, 1995 when he stated that he would reduce Manela's position slowly and in small transactions.[93] Defendants argue that

---

83. *Newburger, Loeb & Co.,* 563 F.2d at 1069.

84. This assumes that the broker is under a duty to speak. *See Chiarella v. United States,* 445 U.S. 222, 229, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). It appears that such a duty would arise from the superior knowledge of the broker and the customer's reliance whenever the control element of the churning cause of action is made out. *See Charles Hughes & Co. v. SEC,* 139 F.2d 434, 437 (2d Cir.1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944) (duty to speak arises from superior knowledge); 4 BROMBERG § 15.08(210) (tests for determining control).

85. The broker's deception of the customer as to the reasons for the trading would give rise to a Rule 10b–5 claim because it lulls the customer into foregoing available remedies. *See Kamerman v. Steinberg,* 891 F.2d 424, 431 (2d Cir. 1989); *Field v. Trump,* 850 F.2d 938, 948 (2d Cir.), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

86. Pl. Mem. at 21. This is consistent with the better reasoned authorities. *E.g., Baum v. Phillips, Appel & Walden, Inc.,* 648 F.Supp. 1518, 1526 n. 5 (S.D.N.Y.1986), *aff'd,* 867 F.2d 776, *cert. denied,* 493 U.S. 835, 110 S.Ct. 114, 107 L.Ed.2d 75 (1989)(unauthorized trade not action-

able under Rule 10b–5 absent deception); *Pross,* 585 F.Supp. at 1460–61 (same).

87. This conclusion follows also from the plaintiffs' need to establish both loss causation, *i.e.,* "that defendant's misstatement or misconduct was a 'substantial factor' in causing a loss," IX LOSS 4407, and transaction causation. It is not enough to show, as plaintiffs offer to do here, that Stallone told an untruth which Manela did *not* believe and that Stallone then sold the bonds against Manela's express wishes. The alleged misstatement did not cause the economic loss complained of or cause Manela to engage in the transaction. *See Bennett v. United States Trust Co. of N.Y.,* 770 F.2d 308, 313–14 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Burke,* 981 F.2d at 1379–80.

88. 678 F.Supp. 1023 (S.D.N.Y.1987).

89. *Id.* at 1028–29.

90. *Bischoff v. G.K. Scott & Co.,* 687 F.Supp. 746 (E.D.N.Y.1986).

91. *Id.* at 751.

92. 784 F.Supp. 1059 (S.D.N.Y.1992).

93. Manela Decl. ¶ 22 ("I did request, however, that any such margin call sales be made slowly,

summary judgment is warranted, even taking this allegation to be true, because the evidence conclusively demonstrates a lack of reliance. They point out that Manela testified that he acknowledged to Stallone that he could not stop GBL from selling and merely asked that the sales be made slowly and in $1 million transactions.[94] In other words, Manela's own version of events is that he made a request which Stallone was not bound to accept, but did not take any action in reliance upon Stallone's purported acceptance of that request. This claim therefore fails for the reasons already discussed.

### 4. The January 12 Purchase and the Identity of the Seller

Plaintiffs assert that defendants violated Rule 10b–5 on the morning of January 12, 1995 when Stallone failed to disclose that GBL owned the $40 million face value block of bonds he offered to Manela.[95] Defendants move for summary judgment on this claim on the ground that the identity of the seller of the bonds does not satisfy the "in connection with" requirement of the Rule because the alleged misrepresentation did not concern the value of the securities sold or the consideration received in return.[96] Any confusion as to the identity of the bonds' seller, they assert, has no bearing on the value of what was received or paid.

Plaintiffs rejoin that the omission of the seller's identity "may very well have affected the price Manela paid for the bonds he purchased on January 12."[97] Beyond this tentative assertion, however, plaintiffs point to no evidence supporting the possibility that knowledge of the seller's identity was relevant to the value of the securities or the consideration paid. This is highly significant

for, as Judge Friendly wrote in *Chemical Bank v. Arthur Andersen & Co.,*

"The purpose of § 10(b) and rule 10b–5 is to protect persons who are deceived in securities transactions-to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be."[98]

Here, plaintiffs indeed may have been deceived as to the identity of the seller of the bonds purchased on January 12, but this deception had nothing to do with the value of the bonds themselves. The failure of defendants to identify GBL as the seller of the bonds Manela bought on the morning of January 12, 1995 therefore cannot support a claim under Rule 10b–5.

### 5. The Allegedly Inflated Price of the January 12 Bonds

The next basis for plaintiffs' Rule 10b–5 claim is that the January 12 sale to Manela was made at an above-market price.[99] Defendants move for summary judgment dismissing this claim on the ground that plaintiffs cannot demonstrate reliance and, further, that any reliance was unjustified as a matter of law. They point to Manela's testimony regarding his conversation with Stallone on the morning of January 12:

"[O]ne thing I am sure is I said, Stallone, buy back whatever you can with the money I have at that price. Then he started to argue trying to convince me not to buy .... I don't know the reasons he gave, but the reason I had to buy it back was something is wrong there, and I want to make a point here that I never wanted to sell.

and in $1 million transactions. Stallone told me he would do so.")

**94.** *Id.* ¶ 22 ("I said that if GBL wanted to execute a margin call, I could not stop them."); Pl. Mem. at 9 (citing Manela Dep. 225–26).

**95.** Manela Decl. ¶ 26.

**96.** *Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 108 (2d Cir.1986); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.) (Friendly, J.),

*cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *In re Towers Financial Corp. Noteholders Litigation,* No. 93 Civ. 0810, 1995 WL 571888, at *12–14 (S.D.N.Y.1995); *Bissell v. Merrill Lynch & Co.,* 937 F.Supp. 237, 242 (S.D.N.Y.1996).

**97.** Pl. Mem. at 25.

**98.** 726 F.2d at 943.

**99.** Manela Decl. ¶ 26; Macfarlane Decl. Ex. 26.

For this reason I decided to buy back. Okay? So he was trying—he was trying to disencourage me from buying, and I insisted ... and I said, Stallone, it is my money and it is my risk. Please buy it." [100]

They rely also on Manela's declaration, in which he testified that Stallone hesitated to follow his instructions, that Stallone argued against the purchase, and that Manela insisted upon the sale despite being surprised by the price quoted to him by Stallone.[101] Defendants thus would conclude that Manela intended to purchase bonds on the morning of January 12 without regard to the price of the block and therefore cannot claim that he relied upon Stallone's allegedly implicit representation that the block was being offered at a market price.

Plaintiffs attempt to avoid the impact of Manela's testimony by availing themselves of the presumption of reliance attaching to material omissions. It is not necessary to determine whether this particular allegation is more properly considered an omission or a misrepresentation,[102] however, as it is readily apparent that there is a genuine issue of material fact precluding the Court from granting summary judgment. It does not necessarily follow from Manela's testimony that he would have insisted blindly on the purchase of the block had he known that it was being offered at an above-market price. Indeed, given his asserted desire to replenish his position to the greatest extent possible, it is reasonable to infer that the price of the bonds would have made a significant difference to him, as a lower price would have enabled him to purchase more bonds and thus come closer to achieving his stated goal. A disputed issue of material fact therefore precludes summary judgment on plaintiffs' securities fraud claim based on the allegation that defendants made the January 12 sale at an above-market price.

Defendants' other arguments are similarly flawed. Defendants contend, for example, that the evidence supports the conclusion that the price paid by plaintiffs for the $40 million face value block, 43.25 percent, was not above market. They argue that Eurobrokers was trading $2 million face value blocks at the time of the trade in a range from 42.75 percent to 43 percent.[103] Thus, defendants conclude, the price for the $40 million face value block was at most a half point above the market value of the price for the $2 million blocks, a difference they contend is a reasonable spread in light of the differing sizes of the blocks involved.

This argument involves facts that are in dispute. Defendants have failed to establish that the pricing of $2 million face value blocks is dispositive of the value of a $40 million block or even that the proper inference to be drawn is that the price of the larger block should be lower per unit of face amount than that of smaller blocks.

Defendants are incorrect also when they assert that plaintiffs cannot demonstrate justifiable reliance. Their argument is premised upon the assertion that a sophisticated investor like Manela could not reasonably have relied upon Stallone's implicit assertion as to the market value of the block but was charged with the duty to determine the market value for himself.

 "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." [104] Reliance is not justified if the investor's conduct was reckless.[105] In determining whether conduct rose to the level of recklessness, all relevant factors are

---

100. Manela Dep. 265.

101. Manela Decl. ¶ 26.

102. It may be that allegations of sales made at above-market prices without disclosure of that fact do not require proof of affirmative reliance. Under the "shingle" theory, Rule 10b–5 may be violated by a broker-dealer who marks up a security excessively without disclosing that fact to the buyer. VIII LOSS 3778.

103. Macfarlane Decl. Ex. 26.

104. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir.1993) (citing *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015–16 (2d Cir.1989)).

105. *Id.*

considered.[106] These include, but are not limited to:

"(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction; and (8) the generality or specificity of the misrepresentations." [107]

The Court concludes that these factors are capable of supporting either defendants' or plaintiffs' position. This is, therefore, an issue properly reserved to the jury. Summary judgment on plaintiffs' Rule 10b–5 claim is denied insofar as it is premised upon the alleged failure to disclose that the January 12 sale was made at an above-market price.

### 6. The Events of March 1995

■ Plaintiffs assert that the March 8 through 10 sales of Manela's bonds violated Rule 10b–5 because Stallone allegedly had promised Manela that the loans "would remain in place as long as [Manela] needed to pursue [his] investment strategy." [108] Defendants seek summary judgment on this claim, asserting that plaintiffs have failed to come forward with evidence showing that Stallone's alleged statement was made with the present intent to defraud.[109]

■ Plaintiffs argue that defendants' intent to defraud at the time of the alleged statement is established by the fact that defendants eventually ceased renewing the loans. It is well settled, however, that a defendant's present intent to defraud with respect to a promise of future behavior is not established merely by a failure of future performance. Plaintiffs' reliance on the non-performance of the alleged promise to continually renew the loans therefore is an impermissible attempt to bootstrap a contract claim into a claim of fraud.[110] Accordingly, there is no basis for the securities fraud claims relating to the March sales.

In summary, defendants' motion for summary judgment on the Section 10(b) and Rule 10b–5 securities fraud claims is granted except insofar as it is based on the allegation that defendants violated federal securities law by selling bonds to Manela on January 12 at above-market prices without disclosing that fact to him.

### The State Law Claims

#### 1. Subject Matter Jurisdiction

■ Subject matter jurisdiction over the state law claims is predicated upon 28 U.S.C.

---

**106.** *Id.*

**107.** *Id.* (citations omitted).

**108.** Manela Decl., ¶ 6–7.

Although plaintiffs' papers refer generically to "various misrepresentations and omissions" in the context of the events of March, the alleged promise to renew the loans automatically is the only one that plaintiffs specifically identify and connect with the March 8–10 sales.

**109.** *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgement against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548).

**110.** *See, e.g., Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175–76 (2d Cir.1993) (present intent not to perform a promise, in Rule 10b–5 context, requires more than evidence of subsequent non-

performance); *Falik v. Parker Duryee Rosoff & Haft,* 869 F.Supp. 228, 235 (S.D.N.Y.1994); *Finkel v. Stratton Corp.,* 754 F.Supp. 318, 329 (S.D.N.Y.1990), *aff'd in part and rev'd in part on other grounds,* 962 F.2d 169 (2d Cir.1992) (securities fraud claim insufficiently alleged *scienter* in that it relied exclusively on fact that promise ultimately was not fulfilled). The same is true under New York law. *See, e.g., Murray v. Xerox Corp.,* 811 F.2d 118, 122 (2d Cir.1987) (under New York law, fraudulent intent is not demonstrated by evidence of mere non-performance of a promise (citing *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 576–77 (2d Cir.1969))); *Abelman v. Shoratlantic Dev. Co.,* 153 A.D.2d 821, 822–23, 545 N.Y.S.2d 333, 334 (2d Dept.1989).

Plaintiffs argue also that "none of [defendants'] witnesses claimed that GBL was in fact committed to renewing Manela's loans as long as he required." Pl. Mem. at 27 n. 29. This, however, misconceives plaintiffs' burden to adduce some evidence in opposition to defendants' argument that there is an absence of evidence in support of an essential element of plaintiffs' claim. *Goenaga,* 51 F.3d at 18.

§ 1367(a), which provides, with exceptions not here relevant, that federal district courts which have original jurisdiction "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[111] This language codifies the constitutional analysis set forth in *United Mine Workers of America v. Gibbs*,[112] which held that the "state and federal claims must derive from a common nucleus of operative fact" in order to support pendent jurisdiction.[113]

Given the dismissal of the federal claims save the Rule 10b–5 claim pertaining to the price of Manela's January 12 purchase, few of plaintiffs' common law claims remain within the Court's supplemental jurisdiction. None arising out of the sale of Manela's bonds in March or on January 11 shares a common nucleus of operative fact with the surviving Rule 10b–5 claim and thus they do not form part of the same case or controversy. The nucleus of operative facts underlying the remaining federal claim includes the January 12 conversation between Stallone and Manela and the condition of the bond market that day, but does not include facts relating to whether a margin call was justi-

fied on January 11 or whether the March bond sales violated an oral promise to renew Manela's loans. The Court therefore dismisses all common law claims relating to the January 11 and March sales for lack of subject matter jurisdiction.

Supplemental jurisdiction remains over those common law claims which arise out of the events of January 12.[114] These include claims of common law fraud, breach of contract, breach of the duty of good faith and fair dealing, negligence, and breach of fiduciary duty. Defendants seek summary judgment on the merits of these claims.[115]

*2. The State Law Claims Regarding January 12*

 *a. Common Law Fraud.* In New York,[116] a plaintiff seeking to prove common law fraud generally "must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."[117] In addition, where an omission rather than a misrepresentation is alleged, the plaintiff must demonstrate that the defendant had a duty to disclose.[118] The elements of common law

---

**111.** 28 U.S.C. § 1367(a); *see also Westphal v. Catch Ball Products Corp.*, 953 F.Supp. 475, 479 (S.D.N.Y.1997).

**112.** 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see* 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3567.1 (Supp.1997).

**113.** *Id.* at 725, 86 S.Ct. 1130.
The Second Circuit's recent decision in *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442 (2d Cir.1998), is not to the contrary. *Itar–Tass* held that Section 1367(c), which specifically enumerates the situations in which a district court may decline to exercise existing supplemental jurisdiction, superseded that portion of *Gibbs* which gave district courts relatively broad discretion to decline to exercise existing supplemental jurisdiction. *Id.* at 447. *Itar–Tass* did not suggest, however, that Section 1367(a) altered the *Gibbs* standard for determining whether supplemental jurisdiction exists in the first place.

**114.** Defendants present three arguments in support of partial summary judgment on the issue of damages. All three of these arguments assume the continuing vitality of the January 11 claims,

however, and thus are made moot by the Court's dismissal of those claims. Summary judgment on the damages issue therefore is denied.

**115.** In addition to these claims, plaintiffs assert a claim for unjust enrichment. Defendants do not specifically address this claim as it relates to the events of January 12 in their motion for summary judgment, and thus have failed to articulate any ground supporting summary judgment. The motion is therefore denied as to the unjust enrichment claim.

**116.** Both parties assume that New York law properly governs plaintiffs' state law claims.

**117.** *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995) (citing *Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir.1994); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987); *Albert Apartment Corp. v. Corbo Co.*, 182 A.D.2d 500, 582 N.Y.S.2d 409, 410 (1992)).

**118.** *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995); *In re New York Trap Rock Corp.*, 42 F.3d

fraud thus are largely the same as those of a Rule 10b–5 claim except there is no "in connection with" requirement.[119]

■■■■ Defendants' motion for summary judgment on plaintiffs' common law fraud claims rests on precisely the same grounds as were raised in the context of the Rule 10b–5 claims, but meets with even less success in the common law fraud context. The Court previously rejected defendants' arguments pertaining to the alleged above-market price sale, and there is no reason to reach a different conclusion in the common law fraud context. On the other hand, the sole argument successfully raised against plaintiffs' Rule 10b–5 claim based on the alleged failure to disclose the seller's identity, that it fails to satisfy the "in connection with" requirement, is of no consequence to a common law fraud claim. Summary judgment therefore is denied as to all claims of common law fraud pertaining to the events of January 12.

■■■ *b. Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing.* Plaintiffs assert that defendants breached contractual duties, including the duty of good faith and fair dealing, by making the January 12 sale to Manela at an inflated price. Defendants seek summary judgment on the

ground that this alleged conduct simply does not sound in breach of contract.

Defendants argue that GBL did not act as a creditor in this transaction, rendering the Loan Agreements irrelevant. They argue further that the Deposit Account Agreement, even assuming it is applicable to this transaction, contains no provisions addressing prices and thus is irrelevant also. Defendants characterize this cause of action as an impermissible attempt to convert a claim for breach of fiduciary duty claim into a contract claim in the absence of a contract.

Plaintiffs' sole response to this argument is the assertion that the "negligent performance of contractual services gives rise to both a contract and a tort claim."[120] The problem with it is that it fails to identify any contract or contractual duty violated by the January 12 sale. Whatever other claims may arise out of defendants' conduct on January 12, it is clear that plaintiffs have no cause of action for breach of contract or breach of the duty of good faith and fair dealing. Summary judgment therefore is granted as to these claims.

■■■ *c. Negligence.* Plaintiffs assert also that the January 12 sale was negligent in that it was effected at an unreasonably high price. Defendants respond that the undis-

747, 754 (2d Cir.1994); *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 47 (2d Cir.1993); *see also Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1542 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997) ("fraudulent misrepresentation and fraudulent concealment are different causes of action and demand different elements of proof under New York law.")

A duty to disclose "ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust." *Amsterdam–Rotterdam Bank,* 68 F.3d at 1483. In the absence of a fiduciary relationship, a duty to disclose nonetheless may arise if "one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party," *id.* at 1484 (citing *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993)), or if "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984). In light of the parties'

failure to brief this issue, it is not necessary for the Court to determine whether defendants had a duty to disclose. *See Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT & T Communications,* No. 92 Civ. 7862(KMW), 1996 WL 312535, *9 (S.D.N.Y. June 10, 1996) ("As Judge Walker explained in *Polycast I* [in the analogous context of negligent misrepresentation], those courts that have found, applying New York law, that no special relationship existed have typically done so, not at the pleading stage, but after trial, on the basis that plaintiffs failed to carry their evidentiary burden.") (citing *Polycast Technology Corp. v. Uniroyal, Inc.,* No. 87 Civ. 3297(JMW), 1988 WL 96586, *11, 12 (S.D.N.Y. Aug.31, 1988)).

119. Common law fraud, in addition, must be proved by clear and convincing evidence. *Banque Arabe,* 57 F.3d at 153 (citing *Leucadia, Inc. v. Reliance Ins. Co.,* 864 F.2d 964, 971 (2d Cir. 1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989); *Hutt v. Lumbermens Mut. Casualty Co.,* 95 A.D.2d 255, 466 N.Y.S.2d 28 (1983)).

120. Pl. Mem. at 44.

puted facts demonstrate that the price was not unreasonable and therefore that there was no breach. As noted previously, however, there is a genuine issue of fact as to whether the sale was made at a fair price, and defendants have raised no arguments or evidence compelling a different result in the context of the negligence claim. The motion is denied as to the negligence claim based on the January 12 purchase.

 d. *Breach of Fiduciary Duty.* Plaintiffs contend that the January 12 sale of bonds to Manela at an allegedly inflated price and without disclosure of GBL's ownership interest constituted a breach of fiduciary duty. Defendants contend that they acted as a dealer, not a broker, in making the January 12 sale, and that they owed Manela no fiduciary duty.[121] Even assuming that defendants acted solely as dealer, however, the Court has been provided with no basis for concluding, as a matter of law, that a fiduciary relationship existed between the parties on January 12.

The existence of a fiduciary relationship does not turn on defendants' title,[122] nor can it be determined "by recourse to rigid formulas."[123] Instead, it turns on "whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first."[124] The existence of a fiduciary duty thus depends upon the facts of a particular relationship.[125] Plaintiffs point to numerous facts capable of supporting the conclusion that the necessary relationship of trust and confidence existed between Manela and defendants. For exam-

ple, plaintiffs point out that Manela spoke to Stallone on a near-daily basis[126] and often acted in reliance on Stallone's advice, such as when he invested in the GDF.[127] As there is a genuine fact dispute concerning the existence of a fiduciary duty between the parties, summary judgment on this point is denied.[128]

### Conclusion

Defendants' motion for summary judgment dismissing the federal securities law claims is granted in all respects except that it is denied as to the claim that the January 12 sale of bonds from GBL to Manela was effected at an inflated price and therefore violated Section 10(b) and Rule 10b–5.

Defendants' alternative motion to dismiss the common law claims on jurisdictional grounds is granted in all respects except insofar as the common law claims relate to the events of January 12. Defendants' motion for summary judgment dismissing the common law claims relating to the events of January 12 is granted as to the breach of contract and breach of the duty of good faith and fair dealing claims and otherwise denied.

SO ORDERED.

121. *Id.* at 13–15, 24.

122. *Vannest v. Sage, Rutty & Co., Inc.,* 960 F.Supp. 651, 655 (W.D.N.Y.1997).

123. *Scott v. Dime Savings Bank of New York,* 886 F.Supp. 1073, 1078 (S.D.N.Y.1995), *aff'd,* 101 F.3d 107 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997).

124. *Id.*

125. *Boley v. Pineloch Associates, Ltd.,* 700 F.Supp. 673, 680–81, (S.D.N.Y.1988) (citing *Minpeco, S.A. v. ContiCommodity Services, Inc.,* 552 F.Supp. 327, 331 (S.D.N.Y.1982); *Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 946–47

(S.D.N.Y.1979); *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.,* 800 F.2d 177, 182 (7th Cir.1986) (citing *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 15 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984))).

126. Manela Decl. ¶ 11.

127. Stallone Dep. 177–78.

128. Defendants seek summary judgment on this claim on the additional ground that the price was not improperly inflated. Def. Mem. 46–47. The Court has previously concluded that whether the price was fair is a genuine issue of material fact precluding summary judgment.